UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of E.Q. <br><br> ARBEN QOSJA <br><br>            Petitioner, <br><br> vs. <br><br> SAFETE KRASNIQI <br><br>            Respondent. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) No. _____ <br> ) <br> ) <br> ) <br> ) |

### VERIFIED PETITION FOR RETURN OF THE CHILD TO ENGLAND

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

### I. Preamble

1.    This petition is brought by Arben Qosja ("Mr. Qosja" or "Petitioner"), to secure the return of his child, E.Q., born September 24, 2015 ("E.Q." or the "Child"), who was, without Petitioner's consent or acquiescence, wrongfully removed and retained from England to the Southern District of New York by the Child's mother, Respondent Safete Krasniqi ("Ms. Krasniqi" or "Respondent").

2.    This petition is filed pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980,[1] hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act (hereinafter "ICARA") 22 U.S.C. § 9001 *et seq*. The Hague Convention on the Civil Aspects of International Child Abduction came

---

[1] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10493 (1986), a copy of which is attached hereto as Exhibit A.

into effect between the United Kingdom and the United States on July 1, 1988. Copies of the Hague Convention and ICARA are annexed hereto as **Exhibit A** and **B,** respectively.

3. The Convention is a treaty between sovereign states and theretofore entitled to the same weight and deference as the Constitution of the United States.

4. The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

5. The Hague Convention applies to cases in which one parent wrongfully removes or retains her or his child, who is under the age of 16 years, from the child's "habitual residence" in breach of the other parent's custodial rights, which were being exercised at the time of the wrongful removal and retention of the child. Convention, art. 3.

6. Petitioner respectfully requests that pursuant to Articles 1(a) and 12 of the Convention, this Court order that the subject Child be returned to England, the Child's habitual residence.

## II. Jurisdiction and Venue

7. This Court has jurisdiction pursuant to 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

8. Venue is proper pursuant to 22 U.S.C. § 9003 and 28 U.S.C. § 1391(b) because, upon information and belief, the Child and Respondent are currently residing at 2040 Bronxdale Ave, Apt 1B, Bronx NY 10462 in the Southern District of New York and because this case involves the removal and retention of a child under the age of 16 from his habitual residence of England to the Southern District of New York.

## III. Facts

9. The parties are the parents of the subject Child, who is a citizen of England.[2] The parties were both born in Kosovo and met in London, England in 2001.

10. The parties began living together in London in 2002 and were married on December 23, 2002.

11. The subject Child was born in September 2015, in London, England.

12. The Child has resided in England for most of his life.

13. In November 2016, the family moved to Kent, England. The family subsequently returned to London in July 2017.

14. The parties separated in November 2017.

15. In February 2018, Petitioner moved to Kent.

16. The parties divorced on September 10, 2019. After the divorce, Respondent and the Child remained living in London. E.Q. attended Myatt Garden nursery in London.

17. In October 2019, Respondent and the subject Child returned to Kent, and subsequently moved in with Petitioner in March 2020.

18. In or around the time of the Covid-19 pandemic, Respondent began suffering from psychological issues. This manifested in repeatedly running away from her home in England with the Child. As part of her delusions, Respondent expressed a constant fear that Covid-19 was manufactured in the United Kingdom to harm her Children, and that the government was experimenting on E.Q.

19. The first time Respondent ran away was in September 2020; however, she returned the same day.

---

[2] The parties have another child who is in England and not subject to this petition.

20. On September 24, 2020, Respondent ran away for a second time. With the help of the police, Respondent was located at Ashford International Train Station in Kent, approximately one (1) hour from home on the following day.

21. In and around the end of September, Respondent became fixated on Germany and expressed belief that she and her family would be safe there. The entire family travelled to Germany in an effort to preserve the family unit. The family had no ties, no family and no friends in Germany. The family remained in Germany for two weeks.

22. In mid-October 2020, Respondent and the Child travelled from Germany to Albania by car. Petitioner and the parties' daughter joined them in Albania, and they remained there for approximately one year.

23. On or about February 13, 2021, Respondent went missing again. Petitioner and the children had no idea where Respondent was located. Petitioner contacted the police to help locate Respondent and sought help and CCTV footage from locals.

24. On February 19, 2021, Respondent's friend called Petitioner, stating that she had travelled to her home in Northern Albania. Petitioner was then able to contact Respondent by phone call when she stated that she did not want to return to the main city in Albania where they currently resided, as she no longer felt safe. Petitioner travelled to Northern Albania to locate Respondent and bring her back to the main city in Albania.

25. In mid-March 2021, the family traveled together to the capital city, Tirana, Albania.

26. On March 17, 2021, Respondent visited a psychiatric doctor for the first time in Tirana, Albania, who prescribed her medication for her psychological condition.

27. Respondent agreed to take the medication one time. That same night, Respondent told Petitioner that she did not want to continue taking the medication, and she wanted to run away again. It was evident to Petitioner that Respondent was suffering from a mental health episode.

28. On that evening, Respondent took the subject Child and ran away for a third time. When Petitioner located her and the Child, he was able to convince her to revisit the psychiatrist.

29. From March 17, 2021, through March 26, 2021, Respondent was hospitalized at University Medical Center of Tirana, Albania, where she was diagnosed with Delusion Disorders, and began taking medication for her condition.

30. After being discharged from the hospital, Respondent at some point stopped taking her medication. She became paranoid and anxious of the medication, stating that the medication was prescribed to kill her, and her doctor wanted to harm her.

31. On April 9, 2021, Respondent had another episode.

32. Between May 14, 2021, through May 20, 2021, Respondent returned to University Medical Center of Tirana, Albania, where she was diagnosed with Bipolar (one) Disorder with Psychotic Features.

33. Each time Respondent was admitted to hospital, E.Q. would stay with Petitioner and his sister at a family friend's home in Albania.

34. The family remained in Albania until September 2021, when they finally returned to England.

35. E.Q. was enrolled in Bidborough Primary School from September 20, 2021, through May 27, 2022. While in Albania, E.Q. did not attend school.

36. Respondent continued to take her prescribed medication until Spring 2022, when she had another episode. Petitioner contacted the police, the ambulance, and the mental health crisis team, all in efforts to calm her down.

37. During this period, the mental health crisis team made numerous home visits to check on Respondent's well-being. Respondent's psychiatrist told her to resume taking the medication she was given in Albania. She did not comply.

38. In Spring 2022, Respondent packed up and left England, heading for Albania, and taking E.Q. with her. Petitioner subsequently followed them to Albania.

39. Frome June 9, 2022, through June 20, 2022, Respondent was again hospitalized at University Medical Center of Tirana, Albania.

40. On September 7, 2022, Petitioner and E.Q.'s sister returned home to England. Respondent and E.Q. remained in Albania until December 23, 2022, when they also returned to England.

41. E.Q. returned to Bidborough Primary School from January 5, 2023, until the date of removal, February 21, 2025. He was not attending school at any time in Albania.

42. On December 15, 2023, Respondent had another episode. She left England and travelled to Germany with E.Q. Petitioner followed her, in an attempt to get her to return home to England.

43. On December 20, 2023, Respondent returned to England with E.Q.

44. At the end of February 2024, Petitioner had another episode and returned to Germany again. She did not bring E.Q. with her this time. Respondent travelled to Germany in an attempt to get her to return to England. During this time, E.Q. remained in England with his sister.

45. In Spring 2024, it became clear to Petitioner that Respondent was not going to return to England. Petitioner returned home to care for his two children.

46. Respondent subsequently returned to England on June 26, 2024.

47. In February 2025, Respondent and the subject Child had planned to visit a family friend in Italy during E.Q.'s fall break. Respondent had flights booked to travel to Italy on February 18th and had purchased a return flight for the evening of February 20th.

48. Respondent did not return to England on that date. Petitioner made repeated, fruitless attempts to contact Respondent. Soon thereafter, the family friend that Respondent was visiting contacted Petitioner to inform him that Respondent and E.Q. had departed her home.

49. On February 20, 2025, E.Q. began sharing his location with his sister on his iPad. Petitioner was then able to see that Respondent and E.Q. were in Madrid International Airport.

50. From Madrid, Respondent and E.Q. flew to Portugal.

51. On or about February 21, 2025, Respondent and the subject Child travelled from Portugal to Queens, New York, where she is currently located.

52. Respondent and E.Q. do not have any family in New York. It is unknown to Petitioner as to why Respondent chose to travel to New York.

53. Petitioner and his daughter have virtual access to E.Q., however, he is not allowed to speak to Petitioner or his sister without Respondent's presence. If Petitioner speaks about England or E.Q's potential return, Respondent immediately hangs up the call.

54. On April 1, 2025, Respondent and E.Q. left the home in which they currently reside in Queens, New York and did not return. During this time, E.Q. did not have his iPad with him, and therefore, Petitioner was no longer able to track E.Q.

55. On April 4, 2025, Petitioner was able to get in contact with Respondent. Respondent refused to disclose her exact whereabouts; however, she stated that they were still located in the state of New York. Respondent told Petitioner over the phone that she and E.Q. were at a gaming lounge, namely 'Sky Gaming Lounge', which was located approximately one hour from where she was staying.

56. On April 8, 2025, Respondent contacted Petitioner and informed him that she and the Child returned to 2040 Bronxdale Ave, Apt 1B, Bronx NY 10462, the original address they were residing at upon their arrival in New York.

57. During his life in England, E.Q., engaged in numerous extracurricular activities, such as swimming, playing football, and riding his bike. He also enjoyed playing video games. He made strong connections with school friends and excelled academically in school.

58. The last time Mr. Qosja had physical access to his Child was on February 18, 2025. It has therefore been 51 days since Petitioner has seen his son.

59. Petitioner has rights of custody to the Child as fully set forth below, and he had those same rights of custody on the date Respondent wrongfully removed and retained the Child from their habitual residence of England on or about February 21, 2025.

### IV. Wrongful Removal and Retention of Child by Respondent: Claim for Relief Under the Hague Convention

60. A removal or retention of a child is wrongful under Article 3 of the Hague Convention if: (a) the removal of retention is in breach of custody rights attributed to a person, institution, or other body, either jointly or alone, under the law of the state in which the child was habitually resident immediately before the removal or retention; and (b) at the time of the removal or retention, those custody rights were actually exercised, or would have been exercised, but for the removal or retention of the child. *See* Convention, arts. 3 and 5.

61. The Child's country of "habitual residence," as defined in Article 3 of the Hague Convention is England, which is where the Child habitually resided prior to his wrongful removal and retention in New York beginning on or about February 21, 2025.

62. The Child's habitual residence is England and was England on the date that Respondent wrongfully removed and retained the Child in New York.

63. From the totality of the circumstances perspective, as of the date of removal and retention in February 2025, England was the Child's ordinary home.

64. The Child is fully involved and integrated in all aspects of daily and cultural life in England. He attends school and extracurricular activities in England. E.Q. established close relationships with his school friends during his time there. He has a great social life in England. He participates in playdates and cultural activities in England.

65. Petitioner has rights of custody of the Child within the meaning of Articles 3 and 5 of the Convention.

66. "Custody rights" under the Hague Convention are defined to include "rights relating to the care of the person of the child, and in particular, the right to determine the child's place of residence." *See* Convention, art. 5(a).

67. "Custody rights" "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." *See* Hague Convention, Art. 3.

68. At the time of Respondent's wrongful removal and retention of the Child from England, the Petitioner had and continues to have rights of custody under English law, such that the removal and retention of the Child from England is in violation of English law and is a wrongful removal and retention within the meaning of Articles 3 and 5 of the Hague Convention.

69. The Children Act 1989, Part 1, Section 2(1) provides that "[w]here a child's father and mother were married to, or were civil partners of, each other at the time of his birth, they shall each have parental responsibility for the child."

70. The parties were married at the time of the birth of the child.

71. The Father therefore has joint parental responsibility for the child under The Children Act Part 1, Section 2(1).

72. Parental responsibility is defined in The Children Act 1989 Part 1, Section 3 as "all the rights, duties, powers, responsibilities and authority which by law a parent of a child has in relation to the child and his property."

73. The rights and responsibilities of a person entitled to parental responsibility under English law necessarily involve the "care of the child."

74. Joint parental responsibility is a right of custody under English law and Article 5a of the Hague Convention.

75. The Petitioner has joint parental responsibility for the child as defined by the Children Act 1989. He has this right by operation of law, and he had this right at the time the Respondent removed and retained the child from England to the United States.

76. There are no court orders entered by any court anywhere in the world changing the parties' respective *ex lege* "rights of custody" to the child in this case.

77. The Petitioner has these rights by operation of law with or without any orders having been entered relating to the child by any English court, and he had those rights at the time the Respondent removed and retained the Child from England.

78. Notice is given in this pleading that the Petitioner is relying upon foreign law. Fed.R.Civ.P. 44.1.

79. At the time of the Respondent's wrongful removal and retention of the Child, the Petitioner was exercising custody rights within the meaning of Articles Three and Five of the Convention, in that he is the father of the Child and has exercised custody rights over the Child since he was born. Petitioner never consented, nor acquiesced, to the Child relocating to the United States.

80. E.Q. was born in September 2015 and will be 16 years of age in September 2031. At the time immediately before the wrongful removal and retention of the Child from England, the Child habitually resided in England within the meaning of Article 3 of the Convention.

81. The parties and the Child have predominantly resided in England since E.Q. was born and have never lived in the United States before the wrongful removal and retention.

82. Petitioner does not know of any person or institution not a party to the proceedings who has physical custody of the Child or claims to have rights of parental responsibilities or legal custody or physical custody of, or visitation or parenting time with the Child.

83. The Child is being illegally held in custody, confinement and/or restraint by the Respondent in the Southern District of New York, where the parties and the Child have never previously resided. Upon information and belief, Respondent is keeping the Child at 2040 Bronxdale Ave, Apt 1B, Bronx NY 10462.

84. On or about April 1, 2025, Respondent and E.Q. left the home where they were residing, and did not return. During this period, E.Q. did not have his iPad in his possession, and Petitioner was no longer able to track his son.

85. On April 8, 2025, Respondent and E.Q. returned to the Bronx address.

86. The subject Child is nine (9) years old. The Hague Convention applies to children under 16 years of age and thus applies to this Child. Petitioner has never consented or acquiesced to Respondent's wrongful removal and retention of the Child in New York.

87. Petitioner invokes Article 18 of the Convention, which grants this Court plenary power to order the Child's return at any time.

88. In accordance with the Article 18 equitable return factors set forth in Justice Alito's concurring opinion in *Lozano v. Montoya Alvarez*, 134 S.Ct. 1224 (2014), Petitioner requests that this Court exercise its equitable discretion to return the Child to England under Article 18, even if the Respondent establishes one of the Convention's five narrow discretionary exceptions to return under the Convention.

89. The Child has an interest in returning to England, his country of habitual residence. Petitioner has an interest in exercising his English rights of custody in England.

90. The governments of England and the United States both have an interest in discouraging inequitable conduct and deterring international child abductions.

### V. Provisional Remedies

91. Petitioner requests that the Court issue a Show Cause Order forthwith, ordering the appearance of Respondent before this Court on the first available date on the Court's calendar.

92. Petitioner further requests that this Court issue a Scheduling Order setting an expedited hearing on the Verified Petition for Return of the Child to England.

### VI. Attorney's Fees and Costs

93. Petitioner has incurred attorneys' fees and costs resulting from the Respondent's wrongful removal of the Child.

94. Petitioner respectfully requests that this Court award him all costs and fees incurred to date as required by 22 U.S.C. § 9007.

95. Petitioner will submit a copy of all expenditures as soon as practicable and possible, and will amend these costs from time to time, according to proof and in light of further expenditure resulting from Respondent's wrongful removal and retention of the Child.

### VII. Notice of Hearing

96. Pursuant to 22 U.S.C. § 9003(c), Respondent will be given notice of any hearing pursuant to New York and any other applicable law.

### VIII. Relief Requested

**WHERETOFORE**, it is respectfully requested that the following relief be granted:

a. Set an expedited hearing on the petition and communicate that hearing date and time to petitioner so that petitioner may provide notice of these proceedings and the hearing pursuant to ICARA Section 9003(c);

b. Issue an immediate order that Respondent surrender any and all of her passports and all of the passports of the Child;

c. Issue an order following the hearing, directing that the Child shall be returned to their Habitual Residence of England, pursuant to Article 12 of the Convention;

d. Enter an immediate *ex parte* temporary restraining order prohibiting the removal of the Child from the jurisdiction of this Court pending a hearing on the merits of the Verified Petition, and further providing that no person acting in concert or participating with Respondent shall take any action to remove the Child from the jurisdiction of this Court pending a determination on the merits of this Action;

e. Issue an order directing Respondent to pay Petitioner for all costs and fees incurred to date by reason of the Child's wrongful removal and retention pursuant to 22 U.S.C. § 9007; and

f. Any such further relief as justice and its cause may require.

Date: April 11, 2025

    Respectfully submitted,

/s/ Michael Banuchis
Michael Banuchis, Esq.
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, New York 10170
Telephone: 212-681-6400  Facsimile: 212-681-6999
mbanuchis@gkmrlaw.com

*ATTORNEYS FOR PETITIONER*

ARBEN QOSJA

## VERIFICATION

I, Arben Qosja, solemnly declare and affirm under the penalties of perjury and the laws of the United States of America, that I am the Petitioner in the within action and have read the foregoing Petition and know the contents of the foregoing Petition are true, to the best of my knowledge, except as to those matters alleged upon information and belief.

Dated: April 9, 2025

_____
Arben Qosja